UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ALI R. WILSON,                                     )
                                                   )
      Petitioner,                            )
                                                   )
  v.                                              )     Case No. 4:22-cv-00904-SRC
                                                   )
UNITED STATES OF AMERICA,                          )
                                                   )
      Respondent.                            )

## Memorandum and Order

Alleging ineffective assistance of counsel, Petitioner Ali Wilson seeks to vacate his sentence under 28 U.S.C. § 2255. Wilson claims that his counsel failed to file a notice of appeal as he instructed and provided ineffective assistance at his sentencing hearing, causing him prejudice. However, the Court finds that the record conclusively establishes that Wilson is not entitled to relief and therefore denies Wilson's claims.

## I.    Statement of facts[1]

In December 2018, investigators began an investigation into Ali Wilson and a drug trafficking organization of which he was a member. The DTO imported cocaine and other controlled substances into the St. Louis area and distributed them. In late April 2019, investigators in Texas interdicted a courier carrying multi-kilogram quantities of heroin and methamphetamine destined for the St. Louis area. The courier stated that in late March-early April 2019, he had delivered a shipment of drugs to St. Louis. The courier identified photographs of Wilson and another person as the recipients of that prior shipment of drugs.

---

[1] This section is materially identical to the "Facts" section in Wilson's Guilty Plea Agreement. *See United States v. Ali Wilson,* Case No. 4:20-cr-00196-SRC-1, Doc. 126 at § 4.

In July 2019, investigators learned an individual, referred to as "Person #1," who worked for the DTO's source of supply was coming to St. Louis to meet an incoming load of cocaine and ensure its delivery to the DTO.  Person #1 previously made several such trips to St. Louis.

Investigators thereafter observed Person #1 and another male, known as "Person #2," unload the cocaine from a tractor trailer.  Later that day, Person #2 took the cocaine to a local hotel room where Wilson soon arrived driving a vehicle with a male passenger.  The male passenger entered Person #2's hotel room with gym bags containing cash to pay for the cocaine. After the exchange, the male passenger returned to Wilson's vehicle with the cocaine. Investigators arranged for a traffic stop of the vehicle after it departed the hotel.  During the stop, the police officer asked Wilson and the passenger to exit the vehicle.  Upon that request, Wilson refused and immediately fled the traffic stop traveling at a high rate of speed.

Meanwhile, investigators maintained surveillance of Person #2.  Person #2 ultimately shipped Wilson's cash payment for the cocaine to El Paso via four packages sent through Federal Express.  Investigators interdicted the packages and seized a total of $553,670.00 in drug proceeds hidden inside.

In September 2019, investigators utilized a DEA confidential source to introduce a money counter equipped with a GPS to other members of the DTO.  During the meeting, one of Wilson's associates inquired about purchasing cocaine from the confidential source.  The confidential source informed the associate that he/she could provide two or three kilograms of cocaine.  The associate replied to the confidential source that anything less than 20 kilograms was a waste of time.

In January 2020, investigators identified the residence of co-defendant Marvell Reynolds located at 3315 Kingsley Drive, Florissant, Missouri 63033, as a "stash" location utilized by

Wilson and the DTO.  Investigators noticed a Jeep Cherokee appeared in the driveway of the residence approximately once or twice a month.  Police databases indicated the Jeep Cherokee traveled from Texas each month.

Investigators conducted a series of trash pulls from 3315 Kingsley Drive in February and March 2020.  During the trash pulls, investigators located multiple items associated with drug trafficking: several receipts with large cash purchases, plastic baggies that had the corners removed, multiple shipping labels from the United States Postal Service, and multiple gallon-sized vacuum-sealed bags that appeared to have the shape of a brick indented within.

On March 14, 2020, investigators again observed the Jeep Cherokee at 3315 Kingsley Drive.  On March 15, 2020, investigators observed Reynolds leave his residence empty-handed on multiple occasions and return with one or more bags a short time later.  Later that day, Wilson arrived at 3315 Kingsley driving a black Lincoln MKZ and entered the residence empty-handed.  A short time later, Wilson left the residence carrying two black colored duffle bags accompanied by Reynolds and headed toward his vehicle to depart the residence.

As Wilson and Reynolds reached the vehicle, investigators approached and arrested them.  After obtaining several federal search warrants, investigators discovered the two black duffle bags contained approximately 28 kilograms of cocaine in individually wrapped bricks.  Inside 3315 Kingsley Drive, investigators found Reynolds's Ruger P95DC, 9mm firearm, fully loaded with one cartridge in the chamber; a digital scale containing a white powdery residue; a vacuum-sealing machine; numerous vacuum seal bags; the money counter previously introduced to the organization by the DEA; nine cell phones, approximately one ounce of marijuana; and approximately 10 grams of cocaine.  The Jeep Cherokee was found to contain an after-market "trap" or hidden compartment commonly used to transport drugs and U.S. currency.  The

infotainment system of the Lincoln MKZ indicated the vehicle had previously visited 3315 Kingsley.  Finally, the data from the money counter revealed that, after it was sold to the DTO in September 2019, it went to 3315 Kingsley where it remained until discovered during execution of the search warrant at the residence.  The data further revealed the money counter was typically utilized monthly and counted a total of approximately $664,000 in drug proceeds.

Based upon the evidence and the parties' approximation of the value of the controlled substances that were the subject of the conspiracy, the parties agreed that the amount of controlled substances involved in the conspiracy attributable to Wilson as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, was between 15 and 50 kilograms of cocaine.

## II.    Procedural history[2]

In March 2020, the United States, by way of criminal complaint, charged Wilson with one count of conspiracy to possess with the intent to distribute in excess of 5 kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846.  Doc. 1.  Two days later, a federal grand jury indicted Wilson on one count of conspiracy to possess with the intent to distribute a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) ,846 and one count of possession with the intent to distribute a mixture or substances containing five kilograms or more of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1).  Docs. 19–20.

### A.    Plea agreement

In May 2021, Wilson entered into a plea agreement with the United States.  Doc. 126.  As part of the agreement, Wilson agreed to plead guilty to Count 1, conspiracy to distribute and

---

[2] Unless otherwise specified, the "doc." numbers in the "Procedural history" section and subsections come from *United States v. Ali Wilson*, Case No. 4:20-cr-00196-SRC-1.

possess with the intent to distribute a detectible amount of cocaine, and in exchange, the United States would dismiss Count 2, possession with the intent to distribute a mixture or substances containing five kilograms or more of a mixture or substance containing a detectable amount of cocaine, at sentencing.  Doc. 126 at 1.[3]  The parties also agreed that Wilson's base offense level was 32 and that three levels should be deducted for acceptance responsibility.  Doc. 126 at 7–8. However, the parties left whether Wilson "recklessly created a substantial risk of death or serious bodily injury to another person during the traffic stop described in the Facts section of [the] Agreement pursuant to Section 3C1.2" for the Court's determination.  *Id.* at 8.

As for Wilson's appeal rights, the parties agreed to "waive all rights to appeal all non-jurisdiction, non-sentencing issues . . . ."  *Id.* at 9.  Additionally, Wilson agreed that "[i]n the event that the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to [t]herein, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range" that he would "waive[] all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category." *Id.*

### B.      Change-of-plea hearing

On May 6, 2021, the Court held a change-of-plea hearing at which Wilson pleaded guilty to Count 1 of the Indictment.  Docs. 125–126, 184.  During the hearing, Wilson confirmed that he was fully satisfied with the services that his counsel, Jeffrey Goldfarb, had performed for him in the case.  Doc. 184, Plea Tr. at 6:17–7:5.  Wilson also acknowledged that, before he signed the plea agreement, he had an opportunity to review the entire document (as well as the various previous versions) and ask Goldfarb any questions.  *Id.,* Plea Tr. at 10:22–12:25.

---

[3] The Court cites to the page numbers assigned by CM/ECF.

Wilson confirmed that all the facts set forth in section four of the plea agreement are true and correct, and that he did, in fact, do all of those things:

> **THE COURT:** And do you agree that all of the facts set forth in Section 4 of the guilty plea agreement are true and correct and that you, in fact, did do all of those things?
>
> **[WILSON]:** Yes.

*Id.,* Plea Tr. at 17:20–23.

The Court specifically asked the parties to clarify whether the appeal waiver applied to the Court's decision on the § 3C1.2 sentencing enhancement related to Wilson's fleeing from law enforcement:

> **THE COURT:** Counsel, I do have a question in terms of the waiver on the sentencing issues. It provides that if the Court accepts the sentencing guidelines total offense level that's agreed to, but there's an agreement as to 29, but then not an agreement as to particular enhancements, one of two points. What I want to clarify is whether this agreement on accepting the total offense level is the 29 or 31 or is it -- is it only 29?
>
> **GOLDFARB:** My understanding is that it's 29, but I will leave it to Ms. Becker if she has a disagreement on it.
>
> **BECKER:** It's my understanding that the parties are going to litigate the two-level issue at sentencing but agree to abide by the district court's determination on that.
>
> **GOLDFARB:** Correct.
>
> **BECKER:** I believe then that if the Court determines the two levels applies and stays within that higher range, the defendant continues to maintain his waiver of appeal.
>
> **GOLDFARB:** Correct. That's a better way of saying it. Once the Court has made a determination on it, that the defendant waives appeal with respect to that particular level once the Court's determined what it is.
>
> **THE COURT:** So if I find it's 29 or if I find it's 21 [sic], it's binding, and the waiver of appeal still is in effect whether I find either 29 or 31?

| | |
|---|---|
| **GOLDFARB:** | Yes, Your Honor. |
| **THE COURT:** | Very good. |
| **BECKER:** | Correct, under either guideline range. |
| **THE COURT:** | Right.  I understand.  I appreciate the clarification. |

*Id.,* Plea Tr. at 22:7–23:11.  The Court then discussed the appeal waiver with Wilson, who stated

he understood:

| | |
|---|---|
| **THE COURT:** | So, Mr. Wilson, do you understand what I was just discussing with the attorneys? |
| **[WILSON]:** | Yes. |
| **THE COURT:** | All right.  So with respect to your waiver on sentencing issues, if I accept your plea and I accept the total offense level that's agreed to, which is either 29 or 31, if I find that that enhancement applies, then after I determine a sentencing range based on that total offense level, as well as your criminal history, if I sentence you above [sic] or within that range, as part of the agreement, you are waiving all right to appeal all sentencing issues other than your criminal history, but only if it affects the base offense level or criminal history category?  Do you understand that? |
| **[WILSON]:** | Yes, sir. |

*Id.,* Plea Tr. at 23:12–24:1.

After a lengthy plea colloquy, the Court asked Wilson how he wished to plead to the

charges of Count 1 of the Indictment.  *Id.*, Plea Tr. at 33:1–2. Wilson responded: "Guilty."  *Id.*,

Plea Tr. at 33:3.  The Court further inquired:

| | |
|---|---|
| **THE COURT:** | Have you understood all of the questions that I've asked you here today? |
| **[WILSON]:** | Yes. |
| **THE COURT:** | Have you answered them truthfully and completely? |
| **[WILSON]:** | Yes. |

| | |
|---|---|
| **THE COURT:** | Do you have any questions for me at this time? |
| **[WILSON]:** | No, sir. |
| **THE COURT:** | Are you pleading guilty because you are, in fact, guilty as charged? |
| **[WILSON]:** | Yes. |

*Id.,* Plea Tr. at 33:4–15.

Having found Wilson was subject to mandatory detention under 18 U.S.C. § 3143(a)(2), the Court ordered Wilson detained at the conclusion of the change-of-plea hearing. *Id.,* Plea Tr. at 34:14–38:1.

### C.    Wilson's post-plea communications

On June 1, 2021, the Court received a letter from Wilson requesting a forensic analysis of the "GPS/money counter."  Doc. 135.  On July 2, 2021, the Court received a second letter from Wilson requesting to withdraw his guilty plea.  Doc. 139.  As Wilson had representation in the matter and "[t]here is no constitutional or statutory right to simultaneously proceed pro se and with benefit of counsel," the Court denied Wilson's requests without prejudice subject to refiling through counsel.  Docs. 136, 141 (quoting *United States v. Agofsky,* 20 F.3d 866, 72 (8th Cir. 1994)).  Wilson filed no subsequent motions.

### D.    Presentence investigation report

Following the change-of-plea hearing, the United States Probation Office prepared a presentence-investigation report.  Doc. 145.  The PSR calculated Wilson's base offense level as 32, just as the parties contemplated in the plea agreement, because the offense involved 24.9207 kilograms of cocaine, which is more than 15 kilograms but less than 50 kilograms of cocaine.  *Id.* at ¶ 33; *see also* doc. 126 at 7.  Noting that Wilson disagreed with the enhancement, the PSR

8

added two levels, pursuant to U.S.S.G. §3C1.2, because Wilson "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer . . . ."  Doc. 145 at ¶ 37; *see also* doc. 126 at 8.  Specifically, the PSR included that Wilson:

> . . . recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, when on July 27, 2019, the defendant having been observed engaged in a suspected narcotics transaction, fled from officers as they attempted to initiate a stop of the defendant's vehicle. The defendant, in an attempt to evade law enforcement, fled while traveling at high rates of speed, putting other persons at risk of death or serious bodily injury.

Doc. 145 at ¶ 30.  Allowing for a three-level reduction for acceptance of responsibility, the PSR determined Wilson's total offense level as 31.  Doc. 145 at ¶¶ 40–42; *see also* doc. 126 at 8.  The PSR determined that Wilson had six criminal history points, resulting in a criminal history category of III, and based upon a total offense level of 31 and a criminal history of III, determined a guideline-imprisonment range of 135–168 months.  Doc. 145 at ¶¶ 62, 98.

Wilson filed a variety of objections to the PSR, including to paragraph 30 where it claims Wilson "recklessly created a substantial risk of death or serious bodily injury . . . when on July 27, 2019, [Wilson] having been observed engaged in a suspected narcotics transaction, fled from officers . . . ." Doc. 151 at ¶ 1.  Wilson argued that his conduct did not rise to the level of putting anyone at risk of death or serious bodily injury and the matter was not related to any narcotics investigation.  *Id.* at 1–2.  The United States responded in support of the two-level enhancement. Doc. 160.

### E.  Sentencing

On August 27, 2021, the Court held a sentencing hearing.  Doc. 162.  Wilson confirmed at the start of the hearing that he pleaded guilty because he is, in fact, guilty as charged.  Doc.

186, Sent. Tr. at 4:3–9.  However, Wilson indicated that he was not fully satisfied with

Goldfarb's services:

> **[WILSON]:**  Well, I just don't feel like Mr. Goldfarb -- I don't feel like he really, really reached, like, remedies or -- I don't think he went all out in this case.  I just feel he could have done a little more, as far as the investigation and the evidence and stuff like that that the government had against me.

> **THE COURT:**  Well, let me ask you this.  Because at the plea you told me that you were fully satisfied with the services Mr. Goldfarb had performed for you.  So the services you are talking about are things that would be pre-plea issues.  So what has arisen between the plea and now that causes you to have some level of dissatisfaction of Mr. Goldfarb?

> **[WILSON]:**  Nothing really has arisen since from there to there.  But all before the plea, I just feel like -- I just feel like we just didn't do all that we could have done.

*Id.,* Sent. Tr. at 4:18–5:9.  Goldfarb responded:

> **GOLDFARB:**  I'm not exactly sure specifics of what Mr. Wilson's alluding to.  There were quite a number of different issues that came up.  He was on house arrest throughout the pendency of this case.  And despite that, over the course of, I believe, 14 months that this case proceeded, I think he's the client I met with the most out of all of them, even despite him being on house arrest.  We continually met, met for hours at a time, talked on the phone repeatedly.

> And there were issues that he brought up that were concerning and those were issues regarding some of the discovery.  And every single one of those I discussed with Mr. Casey.  And at one point there were some records that Mr. Wilson felt we needed.  Mr. Casey didn't even have them.  But he went and got them and got them to us.  Mr. Wilson and I reviewed them on a number of occasions.

> So I'm not sure what we didn't investigate or what issues he might have, but I certainly believe that I did everything I could do with respect to representing him.

*Id.,* Sent. Tr. at 5:12–6:5.  The Court found Wilson's complaints not well taken based on the record in the case in which Wilson earlier expressed that he was fully satisfied with Goldfarb's services.  *Id.,* Sent. Tr. at 6:6–19.  The Court inquired whether Wilson had any other objections to make for the record, and Wilson indicated:

> **[WILSON]**: Not -- not -- well, not really.  I just -- I just feel like we was negotiating the plea. The plea never really changed.  It never really changed.  It just all stayed the same.  I don't see the point of the negotiation.

*Id.,* Sent. Tr. at 6:22–7:1.  The Court explained to Wilson that the United States Supreme Court has held that a defendant does not have a constitutional right to plea bargaining or any sort of plea bargain at all:

> **THE COURT:** Well, I am going to say one more thing on this because you are just raising the same things you raised a few minutes ago. The Supreme Court held some time ago in the case *Weatherford v. Bursey* that a defendant does not have a constitutional right to plea bargaining or any sort of plea bargain at all.
>
> So the United States could simply say we are not going to negotiate, we are just going to go to trial.  So you don't have a right to have any certain terms in a plea agreement. You don't have any right to have back-and-forth in a plea negotiation or the like.   So there's certainly been no constitutional violation that you are raising here.
>
> So with that, we are going to proceed.

*Id.,* Sent. Tr. at 7:2–14.

The Court then heard testimony on the two-level enhancement under U.S.S.G. § 3C1.2.

*Id.,* Sent. Tr. at 14:10–40:4.  The Court overruled Wilson's objection and provided an extensive explanation of its decision:

> **THE COURT:** So I -- the first issue, the issue of a nexus to the instant offense, the defendant's counsel has placed much emphasis on what was in the officer's state of mind as opposed to what

was in the defendant's state of mind.  So I want to make sure we're clear on the language of the guideline at issue, the 3C1.2.  And it's a question of whether the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer.

The evidence clearly establishes that this occurred in the course of fleeing from a law enforcement officer after being stopped. Giving his identification, we know it was Mr. Wilson based on the insurance card and the driver's license. And then the question we address is the factual issue of the recklessly creating a substantial risk of death or serious bodily injury.

The defendant argues that there must be something more than just a dangerous driving -- dangerous conditions created.  And that's contrary to not only the plain text of the guideline itself but also with respect to the commentary in the application notes.

Commentary No. 6 reflects that "if death or bodily injury results," then an upward departure may be warranted.  So that indicates, at a minimum, that neither death nor bodily injury must result from the conduct.  So the factual basis for the objection I find is lacking support; and, therefore, I overrule it on that basis.

With respect to the nexus, then the question is:  Is there a nexus between the offense of conviction, which here is the drug distribution[,] and the conduct of the defendant.  And given that the stop was instigated essentially or initiated by a DEA contact with local law enforcement to make that stop in connection with a drug investigation, an ongoing drug investigation with respect to the conduct of Mr. Wilson, I find that there is a sufficient nexus between the stop, the flight, the unreasonably dangerous flight by Mr. Wilson and the instant offense and offense of conviction.  So I overrule the objection.

*Id.,* Sent. Tr. at 40:19–42:6.

At the conclusion of the hearing, the Court sentenced Wilson to a within-guidelines sentence of 155 months' imprisonment followed by five years' supervised release.  Doc. 165.

That same day, Wilson signed a Local Rule 12.07 Notice of Compliance acknowledging that he was fully informed of his appeal rights, that he did not wish to file a Notice of Appeal, and that he had instructed his attorney not to file a Notice of Appeal.  Doc. 168.  Wilson is currently serving his term of imprisonment at FCI Lompoc in Lompoc, California with a projected release date of July 22, 2031.[4]

### F.      Section 2255 motion[5]

In August 2022, Wilson filed a motion to vacate his sentencing under 28 U.S.C. § 2255. Doc. 1.  Wilson raises two ineffective-assistance-of-counsel claims.  *Id.*  In the first, Wilson claims that Goldfarb was ineffective for refusing to file a notice of appeal as requested by Wilson.  *Id.* at 4.  In the second, Wilson claims that Goldfarb's deficient performance at the sentencing hearing was ineffective and caused him prejudice.  *Id.* at 5.  In response, the United States argues that the Court should dismiss both claims.  Doc. 5.  As Wilson has now filed a reply, his motion is ready for the Court's consideration.  Doc. 8.

## III.    Standard of review

A federal prisoner who seeks relief under 28 U.S.C. § 2255 on grounds "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  To obtain relief under section 2255, the petitioner must establish a constitutional or federal statutory

---

[4] *Find an inmate*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Jan. 31, 2024).
[5] The "doc." numbers in the "Section 2255 motion" subsection come from *Wilson v. United States,* Case No. 4:22-cv-00904-SRC.

violation constituting "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Gomez*, 326 F.3d 971, 974 (8th Cir. 2003).

Claims brought under section 2255 may be limited by procedural default.  A petitioner "cannot raise a nonconstitutional or nonjurisdictional issue in a § 2255 motion if the issue could have been raised on direct appeal but was not." *Anderson v. United States*, 25 F.3d 704, 706 (8th Cir. 1994).  However, the Eighth Circuit has noted in dicta in two cases that, if the error claimed by a petitioner is jurisdictional, the error may be raised on collateral review without being subjected to procedural-default analysis. *Beaulieu v. Minnesota*, 583 F.3d 570 (8th Cir. 2009); *United States v. Mooring*, 287 F.3d 725, 727 (8th Cir. 2002) ("if the error is jurisdictional, the error may be raised on collateral review without being subjected to procedural default analysis."); *but see Tripp v. United States*, No. 1:11CV00118 ERW, 2012 WL 27930 (E.D. Mo. Jan. 5, 2012) ("constitutional or jurisdictional claims not raised on direct appeal cannot be raised in a § 2255 motion unless the movant can establish '(1) cause for the default and actual prejudice or (2) actual innocence.'" (quoting *United States v. Moss*, 252 F.3d 993, 1001 (8th Cir. 2001))); *Snider v. United States*, No. 4:09CV1171 HEA, 2011 WL 6372345 (E.D. Mo. Dec. 20, 2011) (same).

Ineffective-assistance-of-counsel claims may be raised for the first time in a section 2255 motion even if they could have been raised on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003).  This exception exists to prevent petitioners from being forced "to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim." *Id.*  Additionally, a petitioner's attorney may serve as counsel for both the trial and appellate case, and it is unlikely that the attorney would raise a claim of his own ineffective assistance on appeal. *See United States v. Rashad*, 331 F.3d 908, 911 (D.C. Cir. 2003).

A movant "faces a heavy burden" to establish ineffective assistance of counsel pursuant to section 2255. *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000).  To succeed on an ineffective-assistance-of-counsel claim, a movant must show that counsel's performance was deficient and that the deficient performance prejudiced the movant's case. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *United States v. Sera,* 267 F.3d 872, 874 (8th Cir. 2001); *DeRoo*, 223 F.3d at 925.  An attorney's performance is deficient if it falls "below an objective standard of reasonableness." *Strickland,* at 687–88; *Sera*, 267 F.3d at 874.  Two substantial impediments exist to making such a showing.  First, the law applies a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689); *Sera*, 267 F.3d at 874.  Second, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690).  Similarly, counsel is not ineffective for failing to pursue a motion to suppress that he reasonably believes would be futile. *Anderson v. United States*, 762 F.3d 787, 794 (8th Cir. 2014).

If the petitioner's claims are not procedurally barred, the Court must hold an evidentiary hearing to consider the claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]"  28 U.S.C.A. § 2255(b); *see also Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994).  A petitioner is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the petitioner] to relief." *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (citation omitted).  However, a court may dismiss a claim without a hearing "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw*, 24 F.3d at 1043.

IV.     **Discussion**[6]

A.     **Ineffective-assistance-of-counsel claim related to Wilson's failure to file a timely notice of appeal.**

Wilson claims that his attorney provided ineffective assistance by failing to file a notice of appeal after Wilson had instructed him to do so.  Doc. 1 at 4, 7–8.  Ineffective-assistance-of-counsel claims generally require a petitioner to show both deficient performance by counsel and prejudice to the defense caused by that performance.  S*ee Strickland*, 466 U.S. at 687.  However, an attorney's failure to file a notice of appeal after being instructed to do so by his or her client constitutes ineffective assistance entitling petitioner to section 2255 relief, with no inquiry into prejudice or likely success on appeal being necessary.  *Barger v. United States*, 204 F.3d 1180, 1181–82 (8th Cir. 2000); *see also Witthar v. United States,* 793 F.3d 920, 922–23 (8th Cir. 2015).  For a claim to succeed, however, the petitioner must show that he actually instructed his counsel to file an appeal.  *See Holloway v. United States,* 960 F.2d 1348, 1356–57 (8th Cir. 1992).  A bare assertion by the petitioner that he made a request is not, by itself, sufficient to support a grant of relief.  *See Rodriguez v. United States*, 964 F.2d 840, 842 (8th Cir. 1992) (per curiam).

Wilson first claims that shortly after sentencing, he and Goldfarb discussed filing a notice of appeal, and that he expressed to Goldfarb that he wanted him to file a notice of appeal to appeal the two-level enhancement.  Doc. 1 at 7–8.  During the conversation, Wilson claims that Goldfarb informed him that he waived his right to appeal; however, Wilson says it was his understanding that he maintained his right to appeal the two-level enhancement.  *Id.* at 7.  Wilson's alleged understanding is contrary to what was discussed at his change-of-plea hearing.

---

[6] Unless otherwise specified, the "doc." numbers in the "Discussion" section come from *Wilson v. United States*, Case No. 4:22-cv-00904-SRC.

At that hearing, the Court specifically asked if Wilson understood that, if the Court finds that the enhancement applies and sentences him within the sentencing guidelines range, Wilson waives all rights to appeal all sentencing issues other than his base offense level (not total offense level) and his criminal history category:

> **THE COURT:**     So, Mr. Wilson, do you understand what I was just discussing with the attorneys?
>
> **[WILSON]:**     Yes.
>
> **THE COURT:**     All right.  So with respect to your waiver on sentencing issues, if I accept your plea and I accept the total offense level that's agreed to, which is either 29 or 31, if I find that that enhancement applies, then after I determine a sentencing range based on that total offense level, as well as your criminal history, if I sentence you above [sic] or within that range, as part of the agreement, you are waiving all right to appeal all sentencing issues other than your criminal history, but only if it affects the base offense level or criminal history category?  Do you understand that?
>
> **[WILSON]:**     Yes, sir.

*United States v. Wilson*, 4:20-cr-00196-SRC-1, doc. 184, Plea Tr. at 23:12–24:1.

Additionally, the same day as the sentencing hearing, Goldfarb filed a notice of compliance pursuant to Local Rule 12.07(a) that contradicts Wilson's argument.  *United States v. Wilson,* 4:20-cr-00196-SRC-1, doc. 168.  The notice is executed and seemingly confirms that Wilson was fully informed of his appeal rights, that he did not wish to file a notice of appeal, and that he had instructed his attorney not to file a notice of appeal.  *Id.*  However, in his reply, Wilson alleges that he never signed the Notice of Compliance, and if the form is signed, that his signature was forged.  Doc. 8 at 3.  He goes on to say that "[t]he forged signature on the 12.07 form proves that Counsel Goldfarb is a dishonest individual."  *Id.* at 6.

The Court finds it incredible that Goldfarb forged Wilson's signature on the Notice of Compliance with Local Rule 12.07(A) form and checked the box that states "[d]efense counsel

has explained to defendant his/her right to appeal and defendant has not requested that counsel file a Notice of Appeal." *See United States v. Wilson,* 4:20-cr-00196-SRC-1, doc. 168.  Goldfarb would have no reason to do so as the form contains a box that states "[t]he defendant declines to sign this notice." *See id.*  Wilson's self-serving assertion lacks support.

The United States submitted an affidavit from Goldfarb testifying about Goldfarb's conversation with Wilson regarding filing a notice of appeal.  Doc. 5-1.  In his affidavit, Goldfarb states that "[a]t the end of Wilson's sentencing, [he] asked [Wilson] if he wanted [him] to file a notice of appeal on his behalf" and Wilson "directed [Goldfarb] not to file a notice of appeal for him." *Id.* at ¶¶ 11–12.  Goldfarb states that "Wilson also signed the local form (12.07) indicating he did not want to appeal." *Id.* at ¶ 13.  "In light of Mr. Wilson's directive after his sentencing, [Goldfarb] did not file a notice of appeal and, instead, filed the completed 12.07 form." *Id.* at ¶ 14.

In his reply, Wilson attaches a September 1, 2021 text message from Krisie Aikens, his apparent fiancée, that Wilson claims clearly shows that he wanted Goldfarb to take action in filing the notice of appeal within the 14 days to so:

> Hi this is Krisie Ali girlfriend he wanted to know if he could go back to court to try to get the two extra points taken off he said something about that he only has 14 days to try and do so please give me a call or text me back at your earliest

Doc. 8-2 at 4.  Goldfarb responded on September 9, 2021:

> Sorry, just saw this.  Get a lot of texts and this one got buried.  He can't go back and ask for the two points to be removed.  We made that argument and the Judge ruled on it.  That is something that's considered discretionary for the Judge meaning he can do what he thinks is correct.  Had we agreed to them and Ali now wants to take that back, we still would likely be out of luck, but that wasn't the case.  Instead, we left it to the Judge to decide and this is the decision he made so we can't go back to him and ask him to change his mind.

*Id.* at 5.  Aikens responded, "Ok thank you." *Id.*

Wilson also attached an affidavit from Aikens.  Doc. 8-2 at 1.  Aikens claims that by sending her September 1, 2021 text message, she "was *attempting to express* Ali Wilson's desire to have [Goldfarb] appeal his sentencing and he only had 14-days [sic] to have it done."  *Id.* at ¶ 2 (emphasis added).  However, Aiken's September 1, 2021 text says nothing about Wilson's desire for Goldfarb to file a notice of appeal on his behalf, and her affidavit somewhat acknowledges this absence of a request to file the notice in that she avers that she was "*attempting* to express" Wilson's desire to appeal.  *See* doc. 8-2 at 1, 4.  The word "appeal" is nowhere in her message.  *Id.* at 4.  Aikens's text simply asks "if [Wilson] could go back to court to try to get the two extra points taken off . . . ."  *Id.*  While Aiken's text does mention a 14-day deadline, she isn't clear about what 14-day deadline she is referring to.  For instance, Federal Rules of Criminal Procedure 35 also contains a 14-day deadline for the Court to "correct a sentence that resulted from arithmetical, technical, or other clear error."  Fed. R. Crim. P. 35(a).  Goldfarb's response simply states that the undersigned considered Wilson's objection on the enhancement and overruled it so he can't go back and ask the undersigned to change his mind.  Doc. 8-2 at 5.  Goldfarb's response does not inform Aikens that Wilson cannot file an appeal, and Aikens's text does not direct Goldfarb to file a notice of appeal.  *See id.* at 4–5.

The text messages submitted contradict Aikens's affidavit, and the Notice of Compliance filed pursuant to Local Rule 12.07(a) contradicts Wilson's arguments.  Goldfarb's affidavit and recitation of the events, on the other hand, are completely consistent with the Notice of Compliance.  Further, that Wilson entered into an appeal waiver and received a within-the-guidelines-range sentence, while not determinative, is further evidence that Goldfarb's recitation of the facts and the Notice of Compliance signed by Wilson, directing Goldfarb not to file a notice of appeal, is reliable.

While § 2255 generally entitles a movant to a hearing on the merits of his petition, there

is a well-established exception to this rule when the files and the records of the case conclusively

show that petitioner is not entitled to relief. *Hodges v. United States,* 368 U.S. 139, 140 (1961);

*Cheek v. United States,* 858 F.2d 1330, 1333 (8th Cir. 1988). This is such a case, as the

contemporaneous record conclusively refutes Wilson's after-the-fact assertions.

### B.      Ineffective-assistance-of-counsel claim related to Wilson's guilty plea and sentencing.

Wilson also claims that "[Goldfarb's] performance was deficient when he advised

[Wilson] to remain silent and not contest anything during the plea hearing, on the notion it could

jeopardize the 3-point reduction for accepting responsibility, when [Goldfarb] was well aware

that [Wilson] had informed [Goldfarb] before the plea hearing, that he left the traffic stop

because he felt threatened by Officer Hundelt, when it was obvious the officer had illegally

racially profiled [Wilson] by pulling [Wilson] over and demanding that [Wilson] get out of the

truck, while the officer was holding his hand on his firearm." Doc. 1 at 9. Additionally, Wilson

claims that he was prejudiced by Goldfarb's failure to investigate, when there was no nexus, nor

did Wilson recklessly leave the scene of the traffic stop, and the two-point enhancement, under

3C1.2 was not warranted. *Id.* However, the record shows the contrary as Goldfarb objected to

and argued against the two-point enhancement.

As Wilson notes, *see* doc. 1 at 11, Goldfarb filed objections specifically arguing that the

enhancement under 3C1.2 was not warranted:

> Defendant objects to Paragraph 30 of the Presentence Investigation Report (PSR)
> wherein it is claimed he, "recklessly created a substantial risk of death or serious
> bodily injury . . . when on July 27, 2019, the defendant having been observed
> engaged in a suspected narcotics transaction, fled from officers . . ." Specifically,
> the conduct cited as the basis for application of USSG §3C1.2 suggests defendant's
> actions put other individuals at risk of death or serious bodily injury. Defendant's
> objection is twofold. First, defendant contends his actions did not rise to the level

of putting anyone at risk of death or serious bodily injury.  Even if all facts stated in the PSR are accepted as true, there were no accidents, no crashes and, in fact, law enforcement ended their pursuit and later merely wrote traffic tickets, the most significant of them being for careless and imprudent driving.  Second, even if this Honorable Court finds defendant did act in a manner consistent with creating a substantial risk of death or serious bodily injury, that particular incident, according to the officer involved, was not related to this matter or any narcotics investigation.  Specifically, the officer relates that his basis for curbing the vehicle related only to traffic violations for (1) failing to signal before turning and (2) failing to come to a complete stop at a stop sign.  No part of the officer's report claims he was involved in or any way investigating any narcotic-based activity.  Defendant argues his purported actions during a traffic stop have no bearing whatsoever on a federal drug conspiracy.

*United States v. Wilson,* 4:20-cr-00196-SRC-1, doc. 151 at ¶ 1.  Goldfarb also cross-examined

Officer Hundelt at sentencing if Wilson was fearful of his safety:

> Q.     And he didn't -- in the beginning he stopped his vehicle; right?
>
> A.     Yes, sir.
>
> Q.     He gave you his insurance card?
>
> A.     Yes, sir.
>
> Q.     He gave you his driver's license?
>
> A.     Yes, sir.
>
> Q.     And things went south, didn't go the way you wanted them to when you asked him to step out because you wanted to speak to him; is that right?
>
> A.     Yes, sir.
>
> Q.     And that was because he told you he was fearful of his safety?
>
> A.     Yes, sir.

*United States v. Wilson*, 4:20-cr-00196-SRC-1, doc. 186, Sent. Tr. at 36:5–18.  Wilson claims

this portion of Officer Hundelt's was truthful.  Doc. 1 at 12.  However, Wilson claims that

Officer Hundelt "was not a credible witness to establish a nexus with a DEA investigation or his

relationship to Wilson's federal drug charges."  *Id.* at 13.

The Court ultimately found Officer Hundelt's testimony credible and overruled Wilson's objection:

**THE COURT:**     So I -- the first issue, the issue of a nexus to the instant offense, the defendant's counsel has placed much emphasis on what was in the officer's state of mind as opposed to what was in the defendant's state of mind.  So I want to make sure we're clear on the language of the guideline at issue, the 3C1.2.  And it's a question of whether the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer.

The evidence clearly establishes that this occurred in the course of fleeing from a law enforcement officer after being stopped.  Giving his identification, we know it was Mr. Wilson based on the insurance card and the driver's license.  And then the question we address is the factual issue of the recklessly creating a substantial risk of death or serious bodily injury.

The defendant argues that there must be something more than just a dangerous driving -- dangerous conditions created.  And that's contrary to not only the plain text of the guideline itself but also with respect to the commentary in the application notes.

Commentary No. 6 reflects that "if death or bodily injury results," then an upward departure may be warranted.  So that indicates, at a minimum, that neither death nor bodily injury must result from the conduct.  So the factual basis for the objection I find is lacking support; and, therefore, I overrule it on that basis.

With respect to the nexus, then the question is:  Is there a nexus between the offense of conviction, which here is the drug distribution and the conduct of the defendant.  And given that the stop was instigated essentially or initiated by a DEA contact with local law enforcement to make that stop in connection with a drug investigation, an ongoing drug investigation with respect to the conduct of Mr. Wilson, I find that there is a sufficient nexus between the stop, the flight, the unreasonably dangerous flight by Mr. Wilson and the instant offense and offense of conviction.  So I overrule the objection.

*United States v. Wilson*, 4:20-cr-00196-SRC, doc. 186, Sent. Tr. at 40:19–42:6.

Wilson believes that "[i]f not for the deficient performance of [Goldfarb,] [his] offense level would have been 29, and the [c]riminal [h]istory III, placing [him] in the [s]entencing range of 108–135 months.  But with the erroneous 2-point enhancement for § 3C1.2, [Wilson] was prejudiced because [sic] it placed him in the offense level of 31, with the [c]riminal [h]istory of III, placing [him] in the [s]entencing range of 135–168 months."  Doc. 1 at 15.

However, Wilson does not identify a single instance of deficient performance by Goldfarb.  Nor does Wilson indicate how a different approach by Goldfarb would have changed the outcome, meaning Wilson has not suffered any prejudice.  *See Stewart v. Kelley,* 890 F.3d 1124, 1128 (8th Cir. 2018).  "There are countless ways to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689.  "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  Goldfarb diligently objected and argued against the two-point enhancement on Wilson's behalf.   Just because the Court found that the two-point enhancement applies to Wilson does not mean that Goldfarb provided Wilson ineffective assistance. *See also Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir. 1994) ("Counsel's failure to advance a meritless argument cannot constitute ineffective assistance.).   As such, the Court finds that Wilson's ineffective-assistance-of-counsel claim fails.

## V.    Conclusion

The Court finds that the record conclusively establishes that Wilson is not entitled to relief.  Therefore, the Court denies Wilson's [1] Motion to Vacate, Set Aside, or Correct

Sentence, and finds that Wilson is not entitled to an evidentiary hearing.  The Court also denies Wilson's [9] Motion to Appoint Counsel and [10] Motion to Expedite Proceedings.

## VI.     Certificate of appealability

The Court further finds that Wilson has not made a substantial showing of the denial of a constitutional right, and therefore, does not issue a certificate of appealability.  *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (explaining a substantial showing is a showing the issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings).

So ordered this 31st day of January 2024.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE